IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

THEODORE COWLEY, SR., o/b/o
NANCY COWLEY, DECEASED,[1]

        Plaintiff,

   v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 16-4800 (JBS)

**OPINION**

APPEARANCES:

Michael J. Brown, Esq.
Wolf & Brown, LLC
228 Kings Highway East
Haddonfield, NJ 08033
    Attorney for Plaintiff

Antonia M. Pfeffer
Special Assistant U.S. Attorney
Social Security Administration
Office of the General Counsel
P.O. Box 41777
Philadelphia, PA 19101
    Attorney for Defendant Commissioner of Social Security

**SIMANDLE**, District Judge:

## I. INTRODUCTION

    This matter comes before the Court pursuant to 42 U.S.C. §

405(g) for review of the final decision of the Commissioner of

---

[1] Theodore Cowley, Sr., the widower of the claimant, Nancy
Cowley, has been substituted as Plaintiff upon the death of Mrs.
Cowley in March of 2017, while this case was pending.

the Social Security Administration ("SSA") denying Plaintiff
Nancy Cowley's ("Plaintiff") application for disability benefits
under Title II of the Social Security Act, 42 U.S.C. § 401, et
seq. The late Nancy Cowley, who suffered from lung cancer, a
history of back surgery, hypertension, obesity, and chronic
pulmonary insufficiency, was denied benefits for the period
beginning May 15, 2013, the alleged date of disability, to
February 12, 2016, the date on which the Administrative Law
Judge ("ALJ") issued a written decision. Unfortunately, Mrs.
Cowley died on March 6, 2017.

In the pending appeal, Plaintiff argues that the ALJ's
decision must be reversed and remanded on four grounds.
Plaintiff contends the ALJ erred by: (1) not finding that
Plaintiff's impairments met the requirements of Listing 3.02,
chronic pulmonary insufficiency; (2) failing to properly
acknowledge and evaluate Plaintiff's degenerative disc disease
and radiculopathy; (3) failing to properly account for the
effects of Plaintiff's obesity; and (4) improperly discrediting
Plaintiff's testimony. This inquiry is limited to the period
from the claimed onset of disability in May of 2013 until the
date of the ALJ's decision in February of 2016, and it does not
examine Mrs. Cowley's status during the post-decision up until
her death in March of 2017. For the reasons stated below, the

Court will affirm the ALJ's decision denying Plaintiff disability benefits.

## II. BACKGROUND

### A. Procedural History

Plaintiff filed an application for disability insurance benefits on January 14, 2014, alleging an onset of disability beginning May 15, 2013. (R. at 16.) On April 15, 2014, the SSA denied the claim, and upon reconsideration on July 27, 2014. (R. at 16.) Hearings were held on December 2, 2015 before ALJ Jennifer Spector, at which Plaintiff appeared with counsel and testified, and at which a vocational expert also testified. (R. at 16.) On February 12, 2016, ALJ Spector denied Plaintiff's appeal at step four of the sequential analysis, finding that Plaintiff was capable of performing past relevant work as a loan processor or mortgage accounting clerk. (R. at 24.) The Appeals Council denied Plaintiff's request for a review and Plaintiff timely filed the instant action. (R. at 1–12.)

On March 6, 2017, Plaintiff passed away from respiratory failure. [Docket Item 16.] Her widower, Theodore Cowley Sr., subsequently filed a Notice Regarding Substitution of Party upon Death of Claimant and entered the case as a substituted party on Plaintiff's behalf. [Id.] "Plaintiff," as used in this Opinion, will refer to the decedent, Nancy Cowley.

**B. Medical History**

The following are facts relevant to the present motion.
Plaintiff was 47 years old as of the date of the ALJ Decision.
(R. at 33.) Plaintiff completed high school and one year of
college. (R. at 170.) She had previous work experience as a loan
processor at a mortgage company. (R. at 53-54, 161.)

        1.   Treatments Prior to Alleged Disability

In 2007, six years before the period of alleged disability
began, Plaintiff was reportedly diagnosed with sciatica and a
herniated disk at L5-S1. (R. at 315.) After physical therapy and
epidurals proved unsuccessful, Plaintiff underwent a
microdiscectomy at the L5-S1 level in early 2009. (R. at 315.)

On May 11, 2010, Plaintiff discussed the possibility of
another back surgery with Dr. Lawrence Deutsch. (R. at 316.) Dr.
Deutsch explained to Plaintiff the nature of the surgery,
including the risks and benefits. (R. at 316.) Dr. Deutsch also
"gave [Plaintiff] a long talk about the negative effects of
cigarette smoking on the musculoskeletal system and in general."
(R. at 317.) On June 16, 2010, Plaintiff underwent a revision
microdiscectomy at the L5-S1 level. (R. at 304-14.)

Two months after the revision surgery, Plaintiff reported
she was "100% better than she was" and had "minimal back pain."
(R. at 283.) According to Dr. Deutsch, "[Plaintiff] continues to
get some left leg pain that comes and goes several times a day,"

but "[s]he finds that she can walk it off." (R. at 283.) Dr. Deutsch prescribed Plaintiff with Percocet and Neurontin, "in case she has discomfort." (R. at 283.) Plaintiff was then given a doctor's note to return to work. (R. at 283.)

On November 15, 2012, Plaintiff was admitted to Kennedy Hospital with complaints of a herniated disk. (R. at 424.) A biopsy revealed that Plaintiff had adenocarcinoma (i.e., lung cancer). (R. at 424.) Shortly thereafter, Plaintiff underwent a successful thoracotomy for the right lobe lobectomy. (R. at 424.) Upon discharge, Plaintiff reported "having no symptoms [and] feeling much better." (R. at 424.)

On March 1, 2013, Plaintiff was again admitted to Kennedy Hospital due to complaints of shortness of breath and dyspnea on exertion. (R. at 436-51.) Plaintiff reported that "her symptoms have come on suddenly in the last 24 to 36 hours" and that she has "significant nasal congestion and rhinorrhea." (R. at 449.) Dr. Thomas Morley determined that Plaintiff had acute exacerbation of chronic obstructive pulmonary disease ("COPD"), acute bronchitis, leukocytosis secondary to bronchitis, continual tobacco dependence, obesity, hypertension, and diet-controlled diabetes. (R. at 449-50.) Dr. Morley noted that Plaintiff "currently is still smoking 1 pack of cigarettes a day [and] has been doing so for 25+ years" (R. at 449), and "once again, [] counseled the importance of continual [sic] of smoking

cessation." (R. at 451.) Plaintiff was released the following day and prescribed with antibiotics, steroids, and other medication. (R. at 451.)

    2.    Impairments During Period of Alleged Disability

On January 14, 2014, Plaintiff filed a claim for disability insurance benefits, alleging that, starting in May 2013, she suffered from lung cancer, a history of back surgery, COPD, diabetes, obesity, and depression. (R. at 169.)

On June 11, 2013, Plaintiff was evaluated by Dr. James Giudice as a follow-up to her lung cancer surgery. (R. at 274-77.) At this meeting, Plaintiff denied any shortness of breath and stated that her symptoms had improved. (R. at 274.) While she reportedly smoked one and a half packs of cigarettes a day for the past 30 years (R. at 275), Plaintiff claimed that, following the surgery, she had not returned to her smoking habit. (R. 278.) Dr. Giudice noted that Plaintiff "appeared healthy, showed no signs of respiratory distress, did not cough or throat clear, could walk without tachypnea," and that her lungs were "clear bilaterally to auscultation and percussion." (R. at 276.) Dr. Giudice also ordered a sleep study to determine whether Plaintiff had significant obstructive sleep apnea. (R. at 278.)

On June 24, 2013, Plaintiff met with Dr. Elyse Kernis to obtain refills on her medications. (R. at 218-21.) During this

appointment, Plaintiff explained she recently quit her job "due to feeling of exhaustion" and reported that she was "not sleeping well" and planned to undergo a sleep study in the next few days. (R. at 218.) Plaintiff also reported smoking five or less cigarettes "some days, but not every day." (R. at 218.) Dr. Kernis observed that Plaintiff was "pleasant, alert and oriented, well developed and well-nourished." (R. at 219.) Dr. Kernis further noted that Plaintiff's lungs were "clear to auscultation bilaterally" and that Plaintiff had "no wheezes/ rhochi/rales," but that Plaintiff had "decreased breath sounds throughout." (R. at 219.) Dr. Kernis prescribed Plaintiff Percocet for her back pain, Albuterol Sulfate for shortness of breath, and VESIcare tablets for an overactive bladder. (R. at 220.) Dr. Kernis also recommended occupational or physical therapy for Plaintiff's obesity, which Plaintiff refused. (R. at 220.)

In March 2014, returned to Dr. Giudice and reported she was experiencing shortness of breath. (R. at 248-52.) At this time, Plaintiff told Dr. Giudice she was considering applying for disability, to which he he responded that she was "borderline." (R. at 252.) Dr. Giudice diagnosed Plaintiff with "mild restrictive physiology due to surgery" and tobacco abuse "questionably terminated 10/18/12," but found "no evidence of

COPD on pulmonary function" and "no evidence of sleep apnea on 06/23/13 study." (R. at 252.)

On September 2, 2014, an MRI revealed "[p]rogressive degenerative changes and left paracentral inferior disc extrusion at L5-S1 producing mild canal stenosis and probable impingement upon the traversing left S1 nerve root." (R. at 413.) Based on the MRI, Dr. Kernis found "[t]here is normal alignment and curvature of the lumbar spine[,] . . . [t]here are mild Modic type II degenerative endplate signal changes[,] . . . [and t]here is new fluid within the L5-S1 disc space which is likely degenerative in etiology." (R. at 412.) Ultimately, Dr. Kernis concluded that these findings "produce mild canal stenosis" and that there was "mild right and moderate to severe left neuroforaminal narrowing which is unchanged" and "stable postsurgical changes status post left hemilaminectomy." (R. at 413.)

Plaintiff returned to see Dr. Kernis several times between June 2013 and September 2015, complaining of both shortness of breath and back pain. (R. at 219-43, 237-407.) Plaintiff's examinations typically showed normal gait, normal reflexes, full strength, normal sensation, and that her lungs were clear to auscultation without wheezes, rhonci, and rales, but that she had decreased breath sounds. (R. at 219, 225, 228, 232, 235, 239, 242, 332, 336, 341, 345, 350, 354, 358, 362, 365, 367, 370,

375, 378, 386, 391, 394-95, 398, 401, 405.) Dr. Kernis continued to prescribe Plaintiff with Percocet and Lyrica and encouraged Plaintiff to quit smoking and lose weight. (R. 358, 376, 379.)

Of note, Dr. Kernis reported several instances where Plaintiff failed to follow her medical advice during this period. For example, in November 2013, Dr. Kernis noted that Plaintiff had not started her recommended diabetes education. (R. at 234.) In February 2014, Dr. Kernis observed that Plaintiff failed to follow-up on a previously-ordered CT scan to check for kidney stones and did not follow her diet and make prescribed lifestyle changes. (R. at 403.) In February 2015, Dr. Kernis also noted that Plaintiff refused to see a pain management specialist. (R. at 365.) And, despite repeated recommendations to stop smoking, Plaintiff continued to smoke at least a pack of cigarettes per day. (R. at 329, 341, 346, 349, 363, 371, 373, 376, 380, 384, 386, 390, 393, 397, 399-400.) For these reasons, among others, Dr. Kernis ultimately concluded that Plaintiff "lacks motivation and refuses to follow advice." (R. at 337.)

On April 2, 2015, Plaintiff began seeing Dr. Edmund Moon. (459-64.) Dr. Moon initially noted that Plaintiff had a "significant tobacco use disorder" and observed that, while Plaintiff reported issues sleeping at night, a sleep study "just demonstrated no sleep apnea." (R. at 459.) Dr. Moon assessed

that Plaintiff's dyspnea was likely caused by a combination of COPD and obesity, with the "biggest issue" being "tobacco use that is ongoing." (R. at 460.) Dr. Moon discussed the need for weight loss and discussed the importance of cutting out unnecessary carbohydrates and fatty meals. (R. at 460.) Dr. Moon further recommended that Plaintiff start a combined regimen of nicotine transdermals and bupropion to help her quit smoking. (R. at 461.)

Plaintiff returned to Dr. Moon on May 5, 2015. (R. at 454-58.) At this follow-up meeting, Plaintiff reported that she continued to have fragmented sleep and had scheduled another sleep study for the following week. (R. at 454.) Dr. Moon observed that Plaintiff "has not made headway in losing weight" and "tried bupropion but not nicotine patches and continues to smoke." (R. at 454.) Dr. Moon again counseled Plaintiff about the importance of weight loss and increasing daily activity. (R. at 456.) Dr. Moon also recommended that Plaintiff consult with a doctor at a smoking cessation center about her tobacco use disorder. (R. at 456.)

On December 12, 2015, Plaintiff testified to the ALJ that she was still smoking "[a] little bit," but had been taking Chantix to try to quit. (R. at 56.)

    3.   Plaintiff's Activities

Plaintiff reported to the SSA that, during the relevant period, she cared for her personal needs, performed light chores, prepared small meals, drove a car, went out alone, shopped in stores for groceries, went outside once a day, played cards twice a week at her sister's house, could lift ten pounds, could walk one block, and watched television. (R. at 177-81, 185-88.) At the hearing, Plaintiff testified to the ALJ that she folded the laundry (R. at 49) and cooked simple meals (R. at 50), but could not tie her shoes (R. 49) and otherwise spent the rest of her day in a recliner chair, sitting with her feet elevated. (R. at 42, 60.) Plaintiff further testified that breathing was her "biggest issue" and that "I can't breathe and I can't walk. Other than that I'm fine." (R. at 40, 51.)

In May 2013, five months after her surgery for lung cancer, Plaintiff quit her job as a loan processor because she "was having a lot of problems breathing." (R. at 55.) Plaintiff briefly returned to work, but was fired for falling asleep on the job. (R. at 46.) Plaintiff has not held a job since being terminated as a loan processor.

### 4.  State Agency Consultants

Dr. Martin Sheehy, a state agency physician, reviewed Plaintiff's treatment records in April of 2014. (R. at 72-75.) Dr. Sheehy noted that Plaintiff was a "severely obese" 45-year-old woman "with chronic back pain." (R. at 74.) Dr. Sheehy

further observed that Plaintiff had "[l]ung restriction on basis
of lung removl [sic] and obesity." (R. at 74.) Based on his
review of Plaintiff's medical records, Dr. Sheehy assessed that
Plaintiff could perform a range of light work involving lifting
and carrying up to twenty pounds occasionally and up to ten
pounds frequently; standing for four hours per workday; sitting
for about six hours per workday; never climbing ladders, ropes,
and scaffolds, but occasionally climbing ramps and stairs;
occasionally balancing and stooping; and frequently kneeling,
crouching and crawling; no concentrated exposure to humidity;
and not even moderate exposure to pulmonary irritants and
hazards. (R. at 73-75.) Dr. Isabella Rampello, another state
agency physician, conducted a review of Plaintiff's medical
records on June 16, 2014, and affirmed Dr. Sheehy's assessment.
(R. at 82-85.)

On April 14, 2014, Dr. Joseph Wieliczko, a state agency
medical consultant, completed a Case Analysis with respect to
Plaintiff's alleged depression. (R. at 72.) Dr. Wielickzo
observed that Plaintiff "is not receiving any medication or
participating in any form of treatment for a [psychiatric]
condition at this time." (R. at 72.) Dr. Wielickzo also found
that "[a] review of the medical evidence in file does not
indicate the presence of a significant psychiatric condition."
(R. at 72.) Accordingly, Dr. Wieliczko found that Plaintiff did

not suffer from any psychological impairments, including depression. (R. at 72.)

### C. ALJ Decision

In a written decision dated February 12, 2016, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of the decision because, consistent with her age, education, work experience, and residual functional capacity ("RFC"), she was capable of performing past relevant work as a loan processor or mortgage accounting clerk. (R. at 24.)

At the first stage of the five-step sequential evaluation process, the ALJ confirmed that Plaintiff had not engaged in substantial gainful activity since May 15, 2013, the alleged onset date of disability. (R. at 18.)

At step two, the ALJ determined that Plaintiff suffered from the following "severe impairments: lung cancer, hypertension, obesity and chronic pulmonary insufficiency." (R. at 18.) The ALJ found that Plaintiff's diabetes mellitus and kidney stones were not severe because they were "stable and/or well-controlled with medication (when she is compliant with prescribed treatment)." (R. at 19) (internal quotation marks omitted). The ALJ did not address Plaintiff's history of back surgery at step two. (Pl. Br. at 21.)

Despite recognizing Plaintiff's impairments as severe, at step three, the ALJ concluded that Plaintiff's impairments did not meet, or equal in severity, any impairment found in the Listing of Impairments set forth in 20 C.F.R. Part 404. (R. at 19.) With respect to Plaintiff's claim that her impairments may meet the requirements of listing 3.02, chronic pulmonary insufficiency, the ALJ found that "[t]he evidence, including Exhibit 8F, fails to document any of the medical results necessary to satisfy the requirements of listing 3.02 with respect to the FEV, FVC, or a chronic impairment of gas exchange as required by the listing." (R. at 19.)

Between step three and step four, the ALJ determined that Plaintiff possessed the RFC to perform "sedentary work," with the limitation that:

> [Plaintiff] can only stand or walk for 1 hour a day in total, can sit up to 8 hours, occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, can only occasionally balance, stoop, kneel, crouch or crawl, can occasionally tolerate exposure to humidity with no exposure to fumes, odors, dusts, gases, extreme cold or heat, hazards, such as unprotected heights and hazardous machinery, and no outdoor work.

(R. at 19.) Although the ALJ found that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," she found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms "are not entirely credible." (R. at 22.) Among

the reasons the ALJ did not find Plaintiff's testimony to be credible was Plaintiff's "extensive history of noncompliance with treatment and medication," as well as her continued use of tobacco after undergoing surgery for lung cancer. (R. at 23.)

Based on testimony by a vocational expert, the ALJ ultimately determined at step four that Plaintiff was capable of performing past relevant work as a loan processor or mortgage accounting clerk. (R. at 24.)

## III. STANDARD OF REVIEW

This Court reviews the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The Court's review is deferential to the Commissioner's decision, and the Court must uphold the Commissioner's factual findings where they are supported by "substantial evidence." 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Cunningham v. Comm'r of Soc. Sec., 507 F. App'x 111, 114 (3d Cir. 2012). Substantial evidence is defined as "more than a mere scintilla," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 400 (1971); Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (using the same language as Richardson). Therefore, if the ALJ's findings of fact are supported by substantial evidence, the reviewing court is bound by those findings, whether or not it would have made the same

determination. _Fargnoli_, 247 F.3d at 38. The Court may not weigh the evidence or substitute its own conclusions for those of the ALJ. _Chandler v. Comm'r of Soc. Sec._, 667 F.3d 356, 359 (3d Cir. 2011). Remand is not required where it would not affect the outcome of the case. _Rutherford v. Barnhart_, 399 F.3d 546, 553 (3d Cir. 2005).

## IV. DISCUSSION

### A. Legal standard for determination of disability

In order to establish a disability for the purpose of disability insurance benefits, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." _Plummer v. Apfel_, 186 F.3d 422, 426 (3d Cir. 1999); 42 U.S.C. § 423(d)(1). A claimant lacks the ability to engage in any substantial activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." _Plummer_, 186 F.3d at 427–428; 42 U.S.C. § 423(d)(2)(A).

The Commissioner reviews claims of disability in accordance with the sequential five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity." 20
C.F.R. § 1520(b). Present engagement in substantial activity
precludes an award of disability benefits. See Bowen v. Yuckert,
482 U.S. 137, 140 (1987). In step two, the claimant must
demonstrate that the claimant suffers from a "severe
impairment." 20 C.F.R. § 1520(c). Impairments lacking sufficient
severity render the claimant ineligible for disability benefits.
See Plummer, 186 F.3d at 428. Step three requires the
Commissioner to compare medical evidence of the claimant's
impairment to the list of impairments presumptively severe
enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If
a claimant does not suffer from a listed impairment or its
equivalent, the analysis proceeds to steps four and five.
Plummer, 186 F.3d at 428. Step four requires the ALJ to consider
whether the claimant retains the ability to perform past
relevant work. 20 C.F.R. § 1520(e). If the claimant's
impairments render the claimant unable to return to the
claimant's prior occupation, the ALJ will consider whether the
claimant possesses the capability to perform other work existing
in significant numbers in the national economy, given the
claimant's residual functional capacity, age, education, and
work experience. 20 C.F.R. § 1520(g); 20 C.F.R. 404.1560(c).

>    **B.    Substantial evidence supports the ALJ's step three
>           determination that Plaintiff's impairments do not meet
>           the requirements of Listing 3.02.**

At step three, the ALJ evaluated whether Plaintiff's impairments, singly or in combination, met or medically equaled the criteria of Listing 3.02, chronic pulmonary insufficiency. (R. at 19.) As relevant here, the ALJ concluded that the "evidence, including Exhibit 8F, fails to document any of the medical results necessary to satisfy the requirements of listing 3.02 with respect to the FEV, FVC, or chronic impairment of gas exchanged as required by the listing." (R. at 19.) Nevertheless, the ALJ still identified Plaintiff's chronic pulmonary insufficiency as a "severe" impairment at step two of the five-step analysis (R. at 18), which was then factored into Plaintiff's RFC. (R. at 19-24.)

Plaintiff argues that the ALJ erred by finding she did not meet the requirements for Listing 3.02(A) or (B). (Pl. Br. at 18-20.) Specifically, Plaintiff argues that the ALJ improperly ignored test results from May 7, 2015, indicating $FEV_1$ and FVC values below the requirements for Listing 3.02. (Pl. Br. at 19; R. at 455.) Plaintiff further argues that, to the extent "the ALJ wanted to see results that complied with the specific technical requirements, then the ALJ still had results which should have required her to investigate this issue by seeking a consultative examination or requesting [Plaintiff] to seek

further testing from her own pulmonary specialist." (Pl. Br. at 20.) The Court is not persuaded by either argument.

Listing 3.02(A) provides: "Chronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02(A). Listing 3.02(B) provides: "Chronic restrictive ventilatory disease, due to any cause, with the FVC equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02(B). Plaintiff's height of 167.8 centimeters (R. at 455) corresponds to an $FEV_1$ value of 1.35 or less and an FVC value of 1.55 or less. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02(A)-(B). "For a claimant to show his impairment matches a listing, it must meet <u>all</u> of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis in original).

Here, substantial evidence supports the ALJ's determination that Plaintiff did not meet all of the requirements of Listing 3.02. First, various physician treatment notes from after Plaintiff's lung cancer surgery indicate that Plaintiff's lungs were "clear to auscultation bilaterally" and that she had a regular breathing rate and effort with no wheezing, rhonchi, or

19

rales. (R. at 350, 354, 358, 362, 365, 367, 370, 378, 381, 386, 389, 394, 398.) Second, multiple tests performed during the period of Plaintiff's alleged disability showed $FEV_1$ and FVC levels well above the required listing range. For example, test results from October 20, 2014 indicate $FEV_1$ values of 1.42 and FVC values of 1.84 (R. at 455), test results from March 12, 2013 show $FEV_1$ values of 1.53 and FVC values of 2.12 (R. at 259), and test results from June 11, 2013 found $FEV_1$ values of 1.45 and FVC values of 1.80. (R. at 266.) Indeed, the May 2015 test results upon which Plaintiff relies, which showed $FEV_1$ values of 1.13 and FVC values of 1.47, are the only ones that show Plaintiff having $FEV_1$ or FVC levels below the requirements for Listing 3.02. (R. at 455.)

Moreover, in light of the well-documented medical evidence in the record, the ALJ properly exercised her discretion in declining to order an additional consultative examination. See Veite v. Astrue, 2011 WL 6780655, at *10 (W.D. Pa. Dec. 27, 2011) ("The decision whether to seek further examinations and consultations regarding a claimant's impairments is discretionary."); Bomentre v. Barnhart, 2008 WL 1815330, at *4 (E.D. Pa. Apr. 18, 2008) ("Even where medical testimony is ambiguous, the Court must defer to the ALJ's decision not to purchase a consultative exam when she finds that the record contains sufficient evidence to make such a decision.").

For these reasons, substantial evidence supports the ALJ's step three determination that Plaintiff's impairments do not meet the requirements of Listing 3.02.

C.     **The ALJ properly acknowledged and evaluated Plaintiff's degenerative disc disease and radiculopathy in the RFC.**

Plaintiff next argues that the ALJ erred by failing to mention Plaintiff's back problems "with any specificity" at any step in her decision. (Pl. Br. at 23.) Instead, Plaintiff argues, the ALJ ignored "clear evidence that [Plaintiff] has severe back problems, supported by objective evidence of both MRIs and nerve conduction studies." (Pl. Br. at 23.)

As Plaintiff correctly points out, the ALJ did not identify any impairment to plaintiff's spine at step two. (R. at 18-19.) The ALJ did, however, extensively describe Plaintiff's back-related medical history before formulating Plaintiff's RFC. (R. at 19-24.) For example, the ALJ noted that Plaintiff was able to increase her activity with Lyrica (R. at 22), and indicated that Plaintiff refused to see a pain management specialist despite her reported back pain. (R. at 23.) After considering the medical evidence and Plaintiff's testimony, the ALJ ultimately determined that Plaintiff had an RFC to perform sedentary work, with the limitation that Plaintiff "can only stand or walk for 1 hour a day in total, can sit up to 8 hours, occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, [and]

can only occasionally balance, stoop, kneel, crouch or crawl."
(R. at 19.)

An individual's RFC constitutes the most the person can do in a work setting despite the limitations imposed by the individual's impairments. See 20 C.F.R. § 404.1545(a)(1). In reviewing the record to make an RFC assessment, the ALJ must take into account all the medical opinion evidence along with all other relevant evidence in the record, 20 C.F.R. § 404.1527(b), and must allocate weight to each medical opinion upon which the ALJ relies. See Weidman v. Colvin, No. 14-552, 2015 WL 5829788, at *9 (M.D. Pa. Sept. 30, 2015).

Social Security Ruling ("SSR") 96-8p dictates that the RFC assessment be a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." In order to meet the requirements of SSR 96-8p, the ALJ "must specify the evidence that he relied upon to support his conclusion." Sullivan v. Comm'r of Soc. Sec., No. 12-7668, 2013 WL 5973799, at *8 (D.N.J. Nov. 8, 2013). Moreover, the ALJ's finding of RFC must be "accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli, 247 F.3d at 41 (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 2011)).

It is well established that "the ALJ - not treating or examining physicians or State agency consultants - must make the

ultimate disability and RFC determinations." <u>Chandler v. Comm'r</u>
<u>of Soc. Sec.</u>, 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R.
§§ 404.1527(e)(1), 404.1546(c)). Furthermore, while an ALJ must
consider the opinions of treating physicians, "[t]he law is
clear . . . that the opinion of a treating physician does not
bind the ALJ on the issue of functional capacity" where it is
not well supported or there is contradictory evidence. <u>Chandler</u>,
667 F.3d at 361 (alteration in original) (quoting <u>Brown v.</u>
<u>Astrue</u>, 649 F.3d 193, 197 n.2 (3d Cir. 2011)).

When a conflict in the evidence exists, the ALJ retains
significant discretion in deciding whom to credit. <u>Plummer</u>, 186
F.3d at 429. The ALJ is entitled to weigh all evidence in making
its finding, and is not required to accept the opinion of any
medical expert. <u>Astrue</u>, 649 F.3d at 196. In discounting
evidence, the ALJ must give a clear explanation for why it is
doing so. <u>Plummer</u>, 186 F.3d at 429; <u>Cotter</u>, 642 F.2d at 704-05.

Here, the ALJ relied on Plaintiff's medical records, the
opinions of two state agency physicians, and Plaintiff's own
testimony to determine that her back-related problems did not
limit her ability to sit for eight hours per day. The ALJ's
determination is well-supported for several reasons. First,
while Plaintiff had surgery on her back in 2009 and 2010,
Plaintiff reported two months after the second surgery that she
was "100% better than she was" and had "minimal back pain." (R.

23

at 283.) Second, the medical records show that Plaintiff reported pain and limitations in walking, but no limitations in sitting. (R. at 227, 230, 237, 332, 339, 369, 380, 384, 388.) Third, Plaintiff was instructed to see a pain management specialist, which she refused to do. (R. at 365) Fourth, Plaintiff testified to the ALJ that she quit her job because she was "having a lot of problems breathing," not because she had significant back pain or any issues sitting for long periods of time. (R. at 55.) Indeed, Plaintiff admitted that she spent most of her day sitting in a recliner chair (R. at 60.)

Ultimately, the ALJ determined that Plaintiff's back-related issues did not affect her ability to sit for long periods of time. For the reasons discussed above, substantial evidence supports the ALJ's consideration of Plaintiff's back-related issues.

### D. The ALJ properly accounted for the effects of Plaintiff's obesity in the RFC.

Plaintiff also argues that the ALJ "failed to provide a reviewable analysis of the effects of Plaintiff's morbid obesity on the RFC." (Pl. Br. at 24.) The record indicates otherwise. Up front, the ALJ explained that SSR 02-01p "requires Administrative Law Judges to consider obesity in determining whether claimants have medically determinable impairments that are severe, whether these impairments meet or equal any listing,

and finally in determining the residual functional capacity." (R. at 18.) The ALJ then observed that Plaintiff was five feet five inches tall and weighed 280 pounds, which corresponded to a BMI 46.6. (R. at 18-19.) As she was required to do, the ALJ considered "any additional and cumulative effects of [Plaintiff's] obesity . . . in assessing [Plaintiff's] impairments under each step of the sequential evaluation process." (R. at 19.) Indeed, the ALJ ultimately determined that Plaintiff's obesity was a "severe" impairment (R. at 18), which was factored into the ALJ's finding that Plaintiff only had the RFC to perform sedentary work, subject to additional limitations. (R. at 19.) Substantial evidence supports the ALJ's treatment of Plaintiff's obesity.

**E.    Substantial evidence supports the ALJ's decision to discount Plaintiff's testimony.**

In assessing Plaintiff's RFC, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms "are not entirely credible." (R. at 22.) Among the reasons the ALJ did not find Plaintiff's testimony to be credible was Plaintiff's "extensive history of noncompliance with treatment and medication." (R. at 23.) Of note, the ALJ explained Plaintiff "failed to stop smoking despite having lung cancer and chronic obstructive pulmonary disease and has not lost weight despite multiple directions to quit smoking and lose

weight." (R. at 23.) The ALJ also observed that, "[w]hile [Plaintiff] attempted to explain away her extensive history of noncompliance with treatment and medication due to cost, she receives some prescriptions and treatment." (R. at 23.) Furthermore, the ALJ explained, "the expense of prescriptions [does not] explain away a refusal to continue taking a medication for more than a few days, as [Plaintiff] noted she has done with respect to Breo and metformin, when presumably it has already been purchased." (R. at 23.)

Plaintiff argues that the ALJ erred in discounting Plaintiff's testimony by: (a) overstating Plaintiff's daily activities; (b) incorrectly finding that Plaintiff was not credible due to her failure to follow medical advice; (c) discounting Plaintiff's complaints that were not supported by medical evidence; and (d) failing to consider Plaintiff's dire financial position and long work history. The Court does not find Plaintiff's arguments to be persuasive because there is substantial evidence in the record supporting the ALJ's determinations of the inconsistencies and implausibilities of Plaintiff's explanations.

"The credibility determinations of an administrative judge are virtually unreviewable on appeal." Hoyman v. Colvin, 606 Fed.Appx. 678, 681 (3d Cir. 2015) (quoting Bieber v. Dep't of the Army, 287 F.3d 1358, 1364 (Fed. Cir. 2002)). Therefore, an

ALJ's credibility determination is accorded great deference and
will not be disturbed unless it is "inherently incredible or
patently unreasonable." See St. George Warehouse, Inc. v. NLRB,
420 F.3d 294, 298 (3d Cir. 2005); see also Blue Ridge Erectors
v. Occupational Safety & Heath Review Comm'n, 261 Fed. App'x
408, 410 (3d Cir. 2008). Pursuant to SSR 96-7p, the ALJ "must
consider the entire case record and give specific reasons for
the weight given to the individual's statements." SSR 96-7p also
"mandates that the [credibility] 'determination . . . must
contain specific reasons for the finding on credibility,
supported by the evidence in the case record, and must be
sufficiently specific to make clear to ... any subsequent
reviewers the weight the adjudicator gave to the individual's
statements and the reasons for that weight." Williams v.
Barnhart, 211 Fed. App'x 101, 105 (3d Cir. 2006) (quoting SSR
96-7p). However, inconsistencies in a claimant's testimony or
daily activities permit an ALJ to conclude that some or all of
the claimant's testimony about her limitations or symptoms is
less than fully credible. See Burns v. Barnhart, 312 F.3d 113,
129-30 (3d Cir. 2002).

The Court finds that the ALJ's credibility determinations
were based on substantial evidence. The record shows that
Plaintiff did, in fact, have an "extensive history of
noncompliance," which the ALJ reasonably determined undermined

27

her credibility regarding the severity of her conditions. (R. at 23.) For example, after being discharged from the hospital against medical advice in November 2015, Plaintiff refused a cardiac-follow up that was recommended by Dr. Viswanath. (R. at 466, 474.) Plaintiff also declined to start her diabetes education, despite a doctor's recommendation to do so. (R. at 234.) Most telling, as detailed above, Plaintiff refused to quit smoking after surviving lung cancer, despite multiple doctors strongly counseling her to do so.

Further, the Court finds that, in making credibility findings, the ALJ properly indicated which evidence she rejected and which she relied upon as the basis for her findings. See Schaudeck, 181 F.3d at 433. A careful review of the ALJ's detailed analysis indicates that the ALJ provided due consideration to Plaintiff's assertions, testimony, and medical record in order to determine Plaintiff's limitations and ability to work. (R. at R. 19-24.) The ALJ, for example, noted that Plaintiff made statements regarding her "debilitating pain" (R. at 23), while the medical records show that Plaintiff refused to see a pain management specialist. (R. at 365.) Furthermore, contrary to Plaintiff's testimony to the ALJ that she "can't make it through the whole grocery store . . . by myself anymore" (R. at 47-48), she reported in her Function Report that she goes

outside once a day, is able to drive a car and go out alone, and that she shops in stores and groceries. (R. at 179-80.)

For these reasons, the Court finds that substantial evidence supports the ALJ's credibility findings.

**V. CONCLUSION**

For all of these reasons, the Court finds that the ALJ followed procedures that comport with the law and that substantial evidence supports the ALJ's decision to deny Plaintiff benefits, and that it should be affirmed. An accompanying Order will be entered.


**October 12, 2017**                          **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              U.S. District Judge